THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAUREN MILLER, ) | |
| ) | |
| *Plaintiff*, ) | No. 22 C 02964 |
| v. ) | |
| ) | Chief Judge Virginia M. Kendall |
| CITY OF AURORA, ) | |
| ) | |
| *Defendant*. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lauren Miller has worked in a variety of capacities for the Defendant City of Aurora ("City") since 2012. She filed this lawsuit alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Equal Pay Act ("EPA"), 29 U.S.C. § 206 on June 7, 2022. (Dkt. 1). Her allegations stem from her time as an IT Department employee from 2018–2021. (*See* Dkt. 1 ¶¶ 9–24). The City moved for summary judgment on June 13, 2024. (Dkt. 50). For the following reasons, the City's Motion for Summary Judgment [50] is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed unless otherwise indicated. Plaintiff Lauren Miller is a 39-year-old female from Bolingbrook, Illinois and has worked for Defendant City of Aurora ("City") since December 2012 with one short gap in her employment in late 2016. (Dkt. 1 ¶ 5; Dkt. 63 ¶ 79).[1] Miller first worked as a Help Desk Technician in the City's Information Technology (IT) Department. (Dkt. 1 ¶ 7; Dkt; Dkt. 58 ¶ 12). In March 2016, she began working

---

[1] Dkt. 63 is the City's Response to Miller's Local Rule 56.1(b)(3) statement of additional material facts. The Court cites to this docket entry for all references to Miller's additional statement of facts, which comprise ¶¶ 79–118. The Court cites to Dkt. 58, Miller's Response to the City's Local Rule 56.1(a)(2) statement of material facts for all references to those facts, which comprise ¶¶ 1–78.

1

as an Aurora Police Officer. (Dkt. 58 ¶ 12). But soon after starting as a police officer, she got in touch with her former supervisor, Ken Nelson, about returning to a position in IT. (Dkt. 63 ¶ 80). On November 29, 2016, Miller resigned as an officer. (Dkt. 58 ¶ 15; Ex. D, Dkt. 51-5 at 23:9–11). She was rehired in January 2017 as a temporary employee. (Dkt. 58 ¶ 16). In this role, she worked within the IT Department under Nelson to deploy the City's Hexagon project,[2] which required Miller to configure and test the system. (Dkt. 58 ¶ 17–18).

While she was working as a temporary employee for the City, Miller was offered a job as a police officer with the Village of Oak Brook, Illinois. (Dkt. 58 ¶ 34). Miller used her Oak Brook offer as leverage with the City, leading to significant back-and-forth between Miller, Nelson, Shanita Thompson (then-Director of IT Operations and Nelson's supervisor), City HR, and the police chain of command. (*See* Ex. D, Dkt. 51-5 at 39:9–47:8; Dkt. 58 ¶ 39). These negotiations ultimately led to the City hiring Miller as a System Analyst I in the IT Department on March 26, 2018, where she made $32.69 per hour. (Dkt. 63 ¶ 81). Miller claims that she successfully negotiated for an additional week of paid time off before accepting the Systems Analyst I position. (Dkt. 63 ¶¶ 100–01). She modeled her additional time off request after one that her fellow IT Department employee John Smith made in his offer negotiations. (*Id.* ¶ 101). The City disputes that it ever promised Miller an additional week off, pointing to language in her offer letter in support of its position. (*Id.* ¶ 100; Ex. P, Dkt. 58-4 at 3).

At the time of Miller's System Analyst I offer, Michael Pegues was the head of the City's IT Department. (Dkt. 58 ¶ 3). Pegues and Thompson had an ongoing conversation about Miller's skills and whether her experience aligned more with the Analyst I or II role. (Dkt. 58 ¶¶ 42–45).[3]

---

[2] Hexagon was a new records management and dispatching system the City was implementing for its police force. (*See* Ex. D, Dkt. 51-5 at 24:11–13).
[3] Miller's response to the City's statement of material fact number 45 is one instance of seventeen where she disputes or denies a fact without citing to any evidentiary material, in direct violation of L.R. 56.1(e)(3) ("To dispute an asserted

Thompson always maintained that Miller was close in experience to Hughes, who was an Analyst II, and should be paid accordingly. (Dkt. 58 ¶ 42). Pegues disagreed. From his perspective, Hughes's nineteen years of IT experience compared to Miller's five to seven rendered the two sufficiently different to justify Miller's placement in the Analyst I role. (Dkt. 58 ¶¶ 44–45). Pegues also told Thompson that, although he had limited contact with the analysts, he thought Miller did not deserve an Analyst II role because she had a bad attitude, talked back to people, and did not always demonstrate appropriate behavior in the workplace. (*See* Dkt. 58 ¶ 43; Ex. E, Dkt. 51-6 at 16:16–17:3).

The parties disagree over the amount of input Pegues took into consideration when making staffing and pay decisions. From the City's perspective, Pegues asked Thompson to create a "skills matrix" that documented each of the analysts' relative job skills. (Dkt. 63 ¶ 96). And Pegues testified that he "supported Thompson's endorsement" when hiring Miller, despite his own reservations. (Ex. B, Dkt. 51-3 ¶¶ 19–20; *see also* Ex. O, Dkt. 58-4). Miller, for her part, points to Thompson's and Nelson's testimony that they felt Pegues did not fully take their perspectives into consideration when making staffing decisions and, in some cases, ignored them outright. (Dkt. 63 ¶ 96; Ex. F, Dkt. 58-2 ¶ 17; Ex. G, Dkt. 58-2 ¶ 2). In the end, Miller was hired as an Analyst I.

Starting in 2017 and into 2018, the City restructured the IT Department, including eliminating certain roles and retitling others. (Dkt. 58 ¶¶ 19–21). During the restructuring, the Analyst I role was created, and other existing positions were reclassified as Analyst IIs and IIIs. (*Id.* ¶ 21). During this process, Jeff Hughes was reclassified as an Analyst II. (*Id.* ¶ 22). Hughes has worked for the City since December 2010. (*Id.* ¶ 23). As a System Analyst II, he was

---

fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact."). The Court deems each fact Miller nominally disputes without evidence to controvert it admitted.

responsible for software configuration and service improvements; he was also required to provide after-hours call support to ensure the City's systems were working properly. (*Id.* ¶¶ 26–27). The parties disagree on the level of responsibility Hughes had in the Analyst II role compared to Miller as an Analyst I. (Dkt. 1 ¶ 14; Dkt. 63 ¶ 84; Dkt. 58 ¶ 45–48).

      Hughes and Miller worked on the Hexagon project in a shared office. (Dkt. 63 ¶ 85). While there is no real dispute that their substantive systems work was comparable, the parties disagree on whether Miller and Hughes had comparable positions on the broader scale. (*Id.*) The crux of the disagreement comes down to whether Hughes as a System Analyst II had any supervisory responsibilities. Miller claims he did not; that the two had the same "skills, a[b]ility, and experience"; and yet, from 2019 to 2021, Hughes earned significantly more than her on average. (Dkt. 58 ¶¶ 40–41; Dkt. 63 ¶ 88).[4] She again points to Thompson's and Nelson's declarations, wherein they both state the System Analyst II did not supervise or oversee the System Analyst I, including when Hughes and Miller occupied those respective positions. (Dkt. 63 ¶ 87; Ex. F, Dkt. 58-2 ¶ 14; Ex. G, Dkt. 58-2 ¶ 16).[5] The City claims that Hughes did have supervisory responsibilities as evidenced by both the Analyst II job description and Pegues's testimony that he expected Hughes to oversee and train the Analyst I. (Ex. B, Dkt. 51-3 ¶ 13; Dkt. 63 ¶ 87; Ex. C, Dkt. 63-3 at 1).

---

[4] The City objects to Miller's statement of fact that Hughes earned, on average approximately $18,366.71 more than Miller between 2019-2021 as based on inadmissible hearsay. (Dkt. 63 ¶ 88). The objection is sustained because the exhibit Plaintiff cites is an unauthenticated pay table that Miller purports to have created and is not supported by any business records or other admissible evidence. The objection to Miller's average pay characterization is immaterial, however, because the City's own statement of material facts and other admissible exhibits in evidence establish that Miller was hired as an Analyst I at Grade 12, Step 3, earning $32.69 per hour or $67,995.20 per year when, at the time, Hughes, as an Analyst II was at Grade 13, Step 7, earning $41.42 per hour or $86,153.60 per year. (Dkt. 58 ¶¶ 40–41; Ex. V, Dkt. 58-5 at 36).

[5] The City's objection to Miller's reliance on Thompson and Nelson's statements for lack of foundation is overruled. Nelson testified that he was the direct supervisor of both Miller and Hughes. (Ex. F, Dkt. 58-2 ¶ 2). Similarly, Thompson testified to being another one of Hughes and Miller's direct supervisors. (Ex. G, Dkt. 58-2 ¶ 12). Both provided an adequate foundational basis for their personal knowledge of Miller and Hughes's job functions.

In May 2020, Miller—under the impression that she had successfully negotiated for an extra week of paid time off—reached out to Human Resources because her vacation balance was for three weeks when she thought it should be four. (Dkt. 63 ¶ 99). She asked HR to correct what the error, and HR responded, telling Miller that her time off was accurate as reflected in her offer letter. (*Id.*; Dkt. 58 ¶¶ 51–52). Miller claims that her male counterpart, John Smith, was able to have his additional week of vacation added to his balance on the back end by contacting HR and suggests that her request should have been treated the same way. (Dkt. 63 ¶¶ 100–101).

On September 2, 2020, Miller filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") claiming the City was "not paying her the same rate as her male counterpart" in violation of the Equal Pay Act and Title VII. (Dkt. 58 ¶ 53). In the fourteen months following her EEOC complaint, the City wrote Miller up on four occasions and assigned her to indefinite leadership coaching.

The first write-up came seven months after the complaint, on April 14, 2021, after Miller had an unauthorized visitor inside a secure IT area at the Aurora Police Department. (Dkt. 58 ¶¶ 56–58). Miller's second write-up was on August 31, 2021 for insubordination after she failed to complete a weekly update by the deadline. (Dkt. 58 ¶ 62; Dkt. 63 ¶ 106). Miller suggests the write-up was unwarranted, citing evidence that she told her supervisor the task she was asked to complete was ordinarily handled by team lead, which she was not, and that the assigning supervisor did not respond to her concerns before the deadline passed. (Dkt. 63 ¶ 106). The City disputes Miller's characterization and points to evidence that she had all she needed to complete the task and never asked for clarification. (*Id.*)

Miller's third write-up was for her absence during an IT Team Meetup on September 30, 2021. (Dkt. 63 ¶ 108). A total of fourteen people were absent from the meeting including Miller,

who was on a separate Hexagon vendor training call scheduled for the same time. (*Id.*) The employee who took attendance at the Team Meeting testified that Miller is the only person he knew of, out of the fourteen, that was written up for her absence. (Dkt. 63 ¶ 108; Ex. I, Dkt. 58-2 ¶ 5). Despite that there was a record of the meeting's attendees, Freddie Williams—the City's Director of Infrastructure and Operations who wrote Miller up—told Miller she was "the only one that [he] was made aware missed the meeting." (Dkt. 58 ¶¶ 60, 66).

Miller's fourth and final write-up was on October 22, 2021 and arose out of two meetings she attended with a Hexagon project vendor and Williams. (Dkt. 58 ¶ 67). The parties dispute the nature of Miller's conduct and tone during the meeting. (Dkt. 58 ¶ 67; Dkt. 63 ¶ 109). Miller claims to have explained some of the difficulties the IT Department was having with the Hexagon system in both meetings. (Dkt. 63 ¶ 109). She further claims that she received praise for sharing the information the first time but a write-up for unprofessional conduct for sharing the same information the second time. (*Id.*) The City claims Miller's tone was abrasive and unprofessional throughout the second meeting, and that she "displayed unprofessional behavior by criticizing Hexagon's actions and direction in a way that questioned their business strategies and ethical motivations." (Dkt. 58 ¶ 67–69). Williams, who was on both calls, testified that he did not think Miller's behavior warranted a write-up but that Pegues, who was not on the call, directed him to issue one anyways. (Dkt. 63 ¶ 110; Ex. D, Dkt. 58-2 at 18:1–19:7).

In May 2020, Pegues assigned leadership coach Mary Reynolds-Clark to begin group coaching for IT Department employees, including two Network Engineer IIIs, a system analyst II, and an IT Support Desk Coordinator. (Dkt. 58 ¶¶ 72–74). Pegues assigned Reynolds-Clark to coach Miller and other employees in the IT Department individually. (Dkt. 58 ¶ 74). Miller was assigned to indefinite coaching with Clark, as were some of her male counterparts. (Dkt. 63 ¶ 111).

6

It is undisputed that prior to April 2021, seven months after Miller's EEOC complaint, she had never been issued a write-up, verbal reprimand, or other written reprimand since joining the City as a help-desk technician in 2012. (Dkt. 63 ¶ 112; *see* Dkt. 58 ¶ 12). Moreover, it was common knowledge amongst City personnel, including Miller's supervisors, that she had filed an EEOC charge. (Dkt. 63 ¶ 113). Miller feared that IT Department leadership was building a false record of discipline against her to develop grounds for her termination. (*Id.* ¶ 116). Eventually, former Aurora Police Commander Mike Doerzaph and Sergeant Ken Thurman offered Miller a position in the Digital Evidence Department. (*Id.* ¶ 115). According to Miller, Doerzaph and Thurman offered her the position to "prevent [her] from being fired." (*Id.*; Ex. A Dkt. 58-1 at 138:3–11). She accepted the lower-paying position and transferred to the Digital Evidence Department, where she presently works. (Dkt. 63 ¶ 116).

## **LEGAL STANDARD**

Summary judgment is appropriate when there is "no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact "exists only if 'there is sufficient evidence' " for a reasonable jury to return a verdict for the nonmoving party. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *see Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. When the parties present competing versions of events, each supported with record evidence, the Court must view that evidence and draw all reasonable inferences in the nonmoving party's favor. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The Court's primary role in ruling on summary judgment is to determine whether there are any genuine issues for trial, not to "evaluate

7

the weight of the evidence or to determine the truth of the matter." *See, e.g., U.S. Commodity Futures Trading Comm'n v. New World Holdings, LLC*, 2012 WL 983790, at *2 (N.D. Ill. Mar. 21, 2012) (quoting *Doe v. R.R Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994)).

## DISCUSSION

### I. Equal Pay Act Claim

A plaintiff must establish three elements to state a *prima facie* claim under the Equal Pay Act: "(1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions." *Fallon v. Illinois*, 882 F.2d 1206, 1208 (7th Cir. 1989). The City first argues that summary judgment is appropriate on Miller's EPA discrimination claim because she has failed to establish the second element of her *prima facie* case. (Dkt. 52 at 4). Specifically, it suggests that Miller's comparable, Jeff Hughes, occupied a position requiring greater skill and responsibility. (*Id.*)

Skill, effort, and responsibility represent three independent and necessary elements for two positions to be comparable under the EPA. *See Cullum v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 698 (7th Cir. 2003). But the inquiry really boils down to whether the two jobs involve a "common core of tasks" or whether "a significant portion of the two jobs is identical." *Stopka v. All. of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998).

The City primarily contends that Hughes and Miller had fundamentally different responsibilities and skills. As a matter of responsibility, the City points to the System Analyst II job description, which provides that the person occupying that position has the responsibility of overseeing and training the System Analyst I. (Ex. C, Dkt. 63-3). Further, Pegues testified that he expected Hughes to supervise Miller. (Ex. B, Dkt. 51-3 ¶ 13). But the jobs that are compared must

be "substantially equal, based on actual job performance and content—not job titles, classifications or descriptions." *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 913 (7th Cir. 2002) (internal quotations and citations omitted). The System Analyst II job description says one thing about the role, but says nothing of how John Hughes performed the job as a practical matter. There are genuine disputes of material fact on this question. For example, Miller has come forward with a declaration from her and Hughes's former direct supervisor who testified that, regardless of what the job description says, "Jeff Hughes did not supervise, oversee, or train Miller." (Ex. F, Dkt. 58-2 ¶¶ 2, 14). Indeed, Nelson went so far as to testify that, from his perspective, Hughes tended to be more "relaxed or lazy," which led to Miller "pick[ing] up the slack." (*Id.* ¶ 5). Viewing this conflicting evidence in the light most favorable to Miller, a reasonable juror could conclude that, as a practical matter, her job responsibilities as a System Analyst I were equal to those of Hughes, a System Analyst II.

Turning to skill, the City points to Hughes's lengthy IT experience as a differentiator. Experience is a relevant factor in considering comparative skill, and it is undisputed that Hughes had more of it than Miller. (Dkt. 58 ¶¶ 44–45); 29 C.F.R. § 1620.15. But another relevant consideration is education, and it is also undisputed that Miller has an associate degree in applied sciences, with a specialty in microcomputer software, while Hughes has no college education at all. § 1620.15; (Dkt. 58 ¶ 14; *see* Dkt. 63 at 10). This is a quintessential dispute of fact over whether Miller and Hughes brought equal skill to the job, taking into consideration their comprehensive backgrounds, rendering it inappropriate to decide on summary judgment.

Setting aside their backgrounds, Miller has presented sufficient evidence to show that her and Hughes's substantive workflows were substantially similar. They worked in the same office, on the same tasks, and split responsibilities evenly for several key assignments. (Dkt. 63 ¶ 85).

9

This body of evidence serves to establish that the two employees shared a common core of job functions, and that their positions were substantially similar; a reasonable jury could decide that Miller has made out a *prima facie* case under the EPA. *Stopka*, 141 F.3d at 685.

Even assuming Miller has stated a *prima facie* claim for relief, the City argues summary judgment is still appropriate because it has demonstrated that Miller's pay difference was based on a factor other than sex. (Dkt. 52 at 4). Once a plaintiff has made out a *prima facie* case, the employer has an opportunity to respond with affirmative defenses that establish the pay differential is due to: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Fallon*, 882 F.2d at 1211. The City relies on "other factor[s]" for Miller and Hughes's pay differential and suggests its decision to pay Hughes more was due to a "*bona fide* seniority system." (Dkt. 52 at 6). The "other factor" affirmative defense encompasses an "almost limited number of factors, so long as they do not involve sex" and prevents courts from disrupting "bona fide job evaluation systems." *Fallon*, 882 F.2d at 1211. According to the City, its seniority system is based on years of service with the city and practical experience an employee brings to the job. (Dkt. 52 at 6).

While the City has certainly identified tenure and experience, gender-neutral criteria, as possible explanations for Miller's salary and position, identifying "potentially explanatory variables" is not enough under the EPA. *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012). Instead, the employer, as the party with the burdens of production and persuasion, must prove those variables "*actually* account for the difference." *Id.* (emphasis in original). Here, the record evidence raises genuine issues of material fact as to whether Miller's ultimate job placement as a Systems Analyst I and her corresponding pay rate, when compared to Hughes, was on account of the City's proffered reasons. For example, the City's statements of fact indicate that

10

Pegues—who had admittedly limited interaction with any of the Systems Analyst—made his ultimate determination on Miller's salary and role based at least in part on his personal feelings that she had a bad attitude and exhibited unprofessional behavior. (Dkt. 58 ¶ 43). Moreover, as discussed more fully above, Thompson, who analyzed Miller and Hughes's backgrounds always maintained that they were essentially equal in terms of substantive IT training and experience. (Dkt. 58 ¶ 42).

The City is correct that the EPA does not demand "a decision-maker take into account all other opinions when establishing a rate of pay." (Dkt. 62 at 10). However, it fails to appreciate that it has the burden of proving no genuine issues of fact exist as to the question of whether the City's alleged seniority system actually and uniformly applied to job and salary decisions like Miller's. *See Leong v. SAP Am., Inc.*, 67 F. Supp. 3d 972, 984 (N.D. Ill. 2014) (denying summary judgment on the "other factor" affirmative defense when the employer failed to prove "as a matter of law that neutral policies fully explain [the employee's] salary" and when "both the existence of those policies and whether they were consistently applied can reasonably be questioned on the current record"). The City has failed to meet its burden in establishing as a matter of law that their so-called seniority system was "bona fide," i.e., that it used and applied the factor in good faith, and thus cannot rely on it as a "convenient escape from liability." *Fallon*, 882 F.2d at 1211. Miller's *prima facie* Equal Pay Act claim survives summary judgment.

## II. Title VII Discrimination Claim

Next, the City argues that summary judgment is appropriate on Miller's Title VII claims. Miller alleges five possible bases for Title VII liability: (1) unequal pay; (2) denial of an additional week of paid time off; (3) her four write-ups; (4) being placed on an "indefinite performance improvement plan"; and (5) hostile work environment. (Dkt. 57 at 11; Dkt. 52 at 7).

11

Title VII prohibits employers from discriminating against any individual with respect to their "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "The critical question on summary judgment is whether [Plaintiff] presented evidence that would permit a reasonable fact-finder to conclude that the [Defendant] took a materially adverse employment action against [Plaintiff] because of her sex." *Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1004 (7th Cir. 2018). Title VII allows a plaintiff to proceed under the "indirect method" in establishing a *prima facie* case of discrimination, whereby she must introduce evidence that she "(1) is a member of a protected class; (2) performed h[er] job satisfactorily; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly-situated employee outside of h[er] protected class." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). Miller invokes the indirect method in defense of all her Title VII claims.

### A. Unequal Pay

Miller argues that the City violated Title VII in paying her less than Hughes. (Dkt. 57 at 12). Assuming *arguendo* that she has established a *prima facie* Title VII pay discrimination claim, summary judgment is still appropriate because she has failed to meet her burden in establishing that the pay discrepancy between her and Hughes was pretextual. *See Benuzzi v. Bd. of Educ. of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011); *Leong* 67 F. Supp. 3d at 980 n.9.

On Miller's EPA claim, the Court found the City failed to meet its burden of proof and persuasion because of conflicting evidence in the record surrounding whether the City had a bona fide seniority system that impacted Miller's pay determination. But the standard is fundamentally different for Miller's Title VII claim. *See, e.g.*, *King*, 678 F.3d at 474 (describing Title VII's burden shifting framework compared to the EPA). Under Title VII, "[i]f the employer articulates a

12

nondiscriminatory reason for the pay discrepancy, the plaintiff must prove that the employer's justification was a pretext for a decision made on prohibited criteria." *Lauderdale v. Ill. Dep't of Hum. Servs.*, 876 F.3d 904, 910 (7th Cir. 2017). Pretext is a two-part inquiry, whereby a Plaintiff must show "the employer's proffered nondiscriminatory reason is a lie *and* the real reason is based on discriminatory intent." *Hobbs v. City of Chicago*, 573 F.3d 454, 461–62 (7th Cir. 2009) (emphasis added).

Miller has failed to provide any evidence that the reason for the pay discrepancy between her and Hughes was discriminatory. *See Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010). As discussed above, Miller has done enough to call into question whether the City had a bona fide seniority system and applied it uniformly. Her evidence indicates some staffing and salary decisions, including hers, at least could have been based on more subjective criteria. But she now bears the burden of proving pretext and has failed to come forward with " 'significantly probative admissible evidence' from which it could be inferred that the employer's reason was false and that the actual reason was discriminatory." *Giwa v. City of Peoria*, 917 F. Supp. 2d 850, 857 (C.D. Ill. 2013) (quoting *Jones v. Union Pac. R.R.*, 302 F.3d 735, (7th Cir. 2002)). Indeed, Miller does not even discuss pretext in her defense of her Title VII discrimination claim. (*See generally* Dkt. 57 at 12–13).

Miller has failed to substantiate her claim that the decision to hire her as an Analyst I at a lower salary than Hughes was in any way based on her gender or otherwise intended to discriminate against her as a woman. *See, e.g.*, *Melgoza v. Rush Univ. Med. Ctr.*, 499 F. Supp. 3d 552, 571–72 (N.D. Ill. 2020) (denying summary judgment on employee's EPA claim but granting summary judgment on Title VII for failure to prove pretext). Her Title VII claim based on unequal pay does not survive summary judgment.

### B. Paid Time Off

To the best of the Court's reading, the City argues Miller's alleged denial of additional paid time off either never happened, was not an adverse employment outcome, or had nothing to do with her gender. (Dkt. 52 at 8–9). Miller, for her part, argues in one paragraph that she was promised an extra week of vacation and treated differently than her coworker, Smith, who was also granted an additional week of PTO as part of his salary and benefit negotiations with the City. (Dkt. 57 at 13).

Reductions or denials of benefits like paid time off constitute adverse employment actions. *Terry*, 910 F.3d at 1005. Here, it remains unclear to the Court after examining the parties' briefing and evidence exactly how much paid time off Miller was initially offered and how the City's Pay Plan was intended to modify her future vacation accrual. What is clear, however, is that when Miller reached out to the City in 2020 to request an adjustment to her time off—consistent with her understanding of her salary negotiations—the City denied that request with reference to her offer letter and its understanding of her eligibility for time-off under the relevant employee Pay Plan. (*See* Ex. C-6–7, Dkt. 51-4 at 16–19). Thus, even if the Court found Miller had made a *prima facie* case with respect to her time off dispute, she has failed to present any evidence to raise a factual dispute surrounding whether the clarification she received in 2020 about her vacation accrual was discriminatory or in any way based on her gender. *See Terry*, 910 F.3d at 1005. Instead, the record evidence supports a finding that the City denied Miller's time-off request based on the language in Miller's offer memoranda and the terms of the Non-Exempt Employee Pay Plan. Accordingly, the City is entitled to summary judgment on Miller's paid time off discrimination theory.

### C. Write-Ups and Performance Improvement Plan

Miller has failed to make out a *prima facie* Title VII claim based on either her four reprimands or her placement on what she labels an indefinite performance improvement plan because neither constitute an adverse employment action. To demonstrate an adverse employment action, the Plaintiff must show that she suffered "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). The harm need not be significant or even material.

Miller identifies the *Muldrow* standard, but she fails to present a single argument respecting how her four write-ups or performance improvement plan altered any identifiable term or condition of her employment. (*See* Dkt. 57 at 4, 12–14). The evidence, on the other hand, indicates that despite Miller's reprimands, both oral and written, her job functions and responsibilities as a System Analyst never changed. As to her individual coaching sessions with Mary Reynolds-Clark, it is not entirely accurate for Miller to construe these sessions as a "performance improvement plan" considering it is undisputed that Pegues hired Reynolds-Clark to coach a wide swath of IT Department employees, on both group and individual bases. (Dkt. 58 ¶ 72). This further undercuts the notion that Miller's assigned coaching sessions harmed the terms or conditions of her employment. Moreover, even if the Court were to construe Miller's regular coaching sessions as a "harm," given the added constraints those sessions placed on her time, Miller has failed to demonstrate that they resulted in her being treated "less favorably than a similarly-situated employee outside of h[er] protected class." *Boss*, 816 F.3d at 917. Miller concedes that two of her coworkers, both men, were also assigned an indefinite term of coaching with Reynolds-Clark. (Dkt. 58 ¶ 74; Dkt. 63 ¶ 111). That she was the only "female, non-exempt employee" assigned to indefinite coaching is of no legal significance.

Summary judgment is appropriate on these Title VII discrimination theories as well.

### D. Hostile Work Environment

Finally, Miller claims that she faced a "hostile work environment" in violation of Title VII. (Dkt. 57 at 11). Miller fails to develop her hostile work environment claim in response to the City's Motion for Summary Judgment, but the Court nonetheless construes her argument as incorporating the above conduct to cumulatively prove her claim. To survive summary judgment on a hostile work environment claim, a plaintiff must establish: "(1) her work environment was objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Rongere v. City of Rockford*, 99 F.4th 1095, 1105 (7th Cir. 2024). Severe or pervasive conduct must be "extreme" under the totality of the circumstances. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 600 (7th Cir. 2021).

Miller falls woefully short of establishing the elements of a hostile work environment claim. While she has detailed unpleasantries and instances of conflict in the office, she has failed to present any evidence of severe, pervasive, or extreme conduct on the part of the City and its employees. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018) ("[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace."). A broad view of the undisputed evidence shows that Miller disagreed with decisions that were made about her salary, responsibilities, discipline, and training. But she has not introduced evidence of any directly harassing or other severe or pervasive conduct on the part of Pegues, or any of her other supervisors. Clearly, Miller was unhappy in her role and felt she was being treated unfairly. But considering the totality of the circumstances, no reasonable juror could find that she faced a hostile

16

work environment. Summary judgment is therefore granted on Miller's Title VII hostile work environment claim.

### III. Retaliation Claims

Miller also raises retaliation claims under both the Equal Pay Act and Title VII based, in her view, on "false or discriminatory write-ups." (Dkt. 57 at 14). Under both statutes, to establish a *prima facie* retaliation claim the Plaintiff must demonstrate: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005). The City does not dispute that Miller engaged in statutorily protected expression when she filed her EEOC complaint in September 2020 alleging unequal pay. (Dkt. 58 ¶ 53). Her retaliation claims thus turn on the second two prongs of the analysis.

As discussed above, the City is correct that reprimands or performance improvement plans do not in themselves constitute adverse employment actions without some additional showing of detriment to a term or condition of employment. *See, e.g.*, *Langenbach v. Wal-Mart Stores*, 761 F.3d 792, 799 (7th Cir. 2014) (negative performance review and a performance improvement plan were not adverse actions). But the City fails to address Miller's claims that the pattern of reprimands, indefinite coaching sessions, and lack of support from HR led her to fear for her job security and ultimately caused her to take a position in a different department at a "significant loss in pay and benefits." (Dkt. 57 at 15–16).

Miller's retaliation claims do not rest on reprimands and coaching sessions alone. Plaintiffs alleging retaliation in the employment discrimination context can establish the adverse employment action element with evidence of "constructive discharge." As relevant here, Miller can demonstrate constructive discharge by showing that her working conditions had become

17

"intolerable" and that her employer's actions communicated to her that "she immediately and unavoidably w[ould] be terminated." *Ziccarelli v. Dart*, 35 F.4th 1079, 1091 (7th Cir. 2022). The evidence suggests Miller feared that the growing list of reprimands, after approximately eight years without a single write-up, was placing her job in imminent danger. (Dkt. 63 ¶ 112, 116; *see also* Dkt. 58 ¶ 12). She testified to conversations she had with others at the City that substantiated those fears. (Ex. A Dkt. 58-1 at 138:3–11). While the City presents a contrary version of events surrounding the reprimands and Miller's eventual departure, Miller has pointed to genuine disputes of material fact that undermine the City's point of view. A reasonable juror could conclude based on the record as a whole, that Miller faced an adverse employment action in the form of constructive discharge.

Finally, there are genuine disputes of material fact as to whether there is a causal link between Miller's EEOC charge and her reprimands, coaching sessions, and, ultimately, departure from the IT Department. To start, it is undisputed that, in 2020 and 2021, it was common knowledge among City personnel, including Pegues and Miller's other direct supervisors, that Miller had filed a charge with the EEOC. (Dkt. 63 ¶ 113). The timing of Miller's reprimands is also important. She racked up four in fourteen months after filing her EEOC complaint when she had before gone approximately eight years at the City with no formal discipline. While suspicious timing alone is generally insufficient to prove causation, it is certainly a relevant factor to the analysis, and here is accompanied by other probative facts. *Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 998 (7th Cir. 2024).

The other particularly relevant evidence to causation has to do with Miller's specific reprimands. This evidence calls into question whether the reprimands were issued for valid reasons and whether other employees were exempt from discipline for substantially similar conduct. For

18

example, with respect to Miller's third write-up for missing a team meeting, Miller cites testimony from the employee who took the attendance who stated that Miller was the only person, out of fourteen absent, who he was aware of that was disciplined. (Dkt. 63 ¶ 108; Ex. I, Dkt. 58-2 ¶ 5). And Freddie Williams, who was on the call with Miller that led to her fourth write-up, testified that Miller's behavior did not warrant discipline but that Pegues, who was not on the call, directed him to issue a reprimand anyways. (Dkt. 63 ¶ 110; Ex. D, Dkt. 58-2 at 18:1–19:7).

Causation in a retaliation claim can be difficult to prove with direct evidence. As such, plaintiffs can rely on circumstantial evidence to establish that they were retaliated against for protected activity. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). Permissible circumstantial evidence includes suspicious timing, evidence that similarly situated employees were treated differently, and any other information that might raise the inference of retaliatory intent. *Id.* Here, Miller has marshalled sufficient circumstantial evidence that could lead a reasonably jury to conclude that she was forced out of her job because of her EEOC complaint. As such, summary judgment is not appropriate on her retaliation claims.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the City's Motion for Summary Judgment [50]. Miller's Equal Pay Act and Retaliation claims remain for trial, Counts I and III in her complaint. (Dkt. 1 at 5, 8). Her Title VII discrimination claims, Count II, are dismissed with prejudice. (Dkt. 1 at 7).

_____
Virginia M. Kendall
United States District Judge

Date: March 29, 2025